**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>GREGORY OBENDORF,<br>*Defendant-Appellant.* | No. 16-30188<br><br>D.C. No.<br>1:15-cr-00254-BLW-1<br><br>OPINION |

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted February 9, 2018
Seattle, Washington

Filed July 9, 2018

Before:  Ronald M. Gould, Richard A. Paez,
and Morgan Christen, Circuit Judges.

Opinion by Judge Christen

## SUMMARY[*]

### Criminal Law

Affirming a conviction for illegally baiting ducks in violation of the Migratory Bird Treaty Act, and conspiring to do the same, the panel held that an "agricultural practice exception" set forth in 50 C.F.R. § 20.21(i)(1) applies to unlawful taking, but not unlawful baiting, and thus could not have immunized the defendant's conduct.

The panel concluded that although the parties misapprehended the law in the district court by treating § 20.21(i)(1) as applicable to the defendant's case, the error was harmless.

### COUNSEL

Greg S. Silvey (argued), Silvey Law Office Ltd., Boise, Idaho, for Defendant-Appellant.

Varu Chilakamarri (argued), Emily A. Polachek, and Andrew C. Mergen, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey H. Wood, Acting Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Christian S. Nafzger, Assistant United States Attorney;

_____

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Rafael M. Gonzalez Jr., Acting United States Attorney; United States Attorney's Office, Boise, Idaho; for Plaintiff-Appellee.

---

## OPINION

CHRISTEN, Circuit Judge:

Defendant-Appellant Gregory Obendorf is an Idaho farmer who was convicted of illegally baiting ducks in violation of the Migratory Bird Treaty Act (MBTA), 16 U.S.C. §§ 703–712, and conspiring to do the same. Obendorf denied that he was baiting ducks and argued that he was simply farming his land. At trial, Obendorf sought to cross-examine government witnesses about the propriety of his farming practices, but the district court would not allow the inquiry. He appeals that ruling and a jury instruction. We have jurisdiction under 28 U.S.C. § 1291, and we affirm Obendorf's conviction.[1]

## BACKGROUND

### I.

Obendorf's farm lies just north of the Boise River, near the town of Parma, Idaho. Hundreds of thousands of ducks pass by the farm during their annual migration each fall. One of Obendorf's fields is about fifteen acres in size and planted with corn. It has come to be known as the duck field, and it figures prominently in this case.

---

[1] We resolve Obendorf's other challenges to his conviction and sentence in a concurrently filed memorandum disposition.

A few times a year, federal agents from the U.S. Fish and Wildlife Service (FWS) patrol the river valleys of southwestern Idaho by airplane, looking for signs of waterfowl baiting. On November 15, 2013, FWS Special Agent Scott Kabasa and two of his colleagues flew over Obendorf's farm. Such flights are routine, but Kabasa paid special attention to Obendorf's farm during the November 15 flight because he had received a number of tips that Obendorf was baiting ducks on his property. As the plane passed over Obendorf's farm, Kabasa noticed several large piles of corn in the duck field, including a pile near a hunting pit blind. Kabasa also noticed the duck field had been harvested differently from other fields on Obendorf's farm. Most of Obendorf's cornfields were fully harvested, but the duck field was "strip combined"—meaning it was harvested in alternating strips such that many rows were left untouched.

That night after dark, Kabasa and Brian Marek, a conservation officer with the Idaho Department of Fish and Game, snuck onto Obendorf's farm to take a closer look. Kabasa and Marek counted six large piles of loose corn kernels on the duck field, including one "within shot-shell range" of the pit blind. They also inspected the strip-combined rows in the duck field and observed "an exorbitant amount" of corn kernels littering the ground under the stalks. Kabasa later testified that "the vastness of the corn that was on the ground was unbelievable." The agents walked Obendorf's other cornfields, which, unlike the duck field, appeared neatly combined and fully harvested. Before leaving, the agents installed a disguised camera called a Plotwatcher in the duck field, pointed it at the pit blind, and programmed it to take and store photographs every few seconds.

State and federal officials returned to Obendorf's farm several more times in the ensuing weeks. On one trip, Kurt Stieglitz, an investigator with the Idaho Department of Fish and Game, installed a second Plotwatcher. Investigators spoke with several current and former Obendorf employees about Obendorf's activities in the duck field. Investigators also met with Obendorf several times during the investigation. Obendorf gave Kabasa and others a tour of his farm, including the duck field, in January of 2014. Obendorf also reached out to Marek several times even after retaining an attorney.

## II.

Nearly two years after the investigation began, Obendorf was charged in a two-count indictment. The first count alleged that Obendorf conspired over several years to bait the duck field and lure ducks for hunting by directing his employees to harvest the duck field wastefully, in violation of 18 U.S.C. § 371 (the general federal conspiracy statute). The second count charged Obendorf with baiting the duck field in November of 2013 to facilitate hunting in the same fashion, in violation of 16 U.S.C. § 704(b)(2), the anti-baiting provision of the MBTA. Both offenses are Class A misdemeanors. *See id.* § 707(a), (c); 18 U.S.C. §§ 371, 3559(a)(6).

The indictment also introduced a wrinkle that gave rise to this appeal. In a series of paragraphs titled "*Relevant Laws and Regulations*," the indictment set forth the MBTA's ban on unlawful baiting, the statutory basis for FWS's authority to enforce the MBTA, and several regulatory definitions. One provision cited in this section of the indictment was

50 C.F.R. § 20.21(i)(1)(i), which the indictment quoted in its
entirety.  That regulation provides:

> Migratory birds on which open seasons are
> prescribed in this part may be taken by any
> method except those prohibited in this section.
> No persons shall take migratory game birds:
>
>      . . . .
>
> (i) By the aid of baiting, or on or over any
> baited area, where a person knows or
> reasonably should know that the area is or has
> been baited.    However, nothing in this
> paragraph prohibits:
>
> (1) the taking of any migratory game bird,
> including waterfowl, coots, and cranes, on or
> over the following lands or areas that are not
> otherwise baited areas—
>
>> (i) Standing crops or flooded standing
>> crops (including aquatics); standing,
>> flooded, or manipulated natural
>> vegetation; flooded harvested croplands;
>> or lands or areas where seeds or grains
>> have been scattered solely as the result of
>> a normal agricultural planting, harvesting,
>> post-harvest manipulation or normal soil
>> stabilization practice[.]

50 C.F.R. § 20.21(i)(1)(i).  The indictment also set forth in
full the regulatory definitions of terms like "normal
agricultural planting, harvesting, or post-harvest

manipulation" and "baited area." As relevant here, whether
a practice constitutes "normal agricultural planting,
harvesting, or post-harvest manipulation" or a "normal soil
stabilization practice" turns on whether the practice is
"conducted in accordance with official recommendations of
State Extension Specialists of the Cooperative Extension
Service of the U.S. Department of Agriculture." 50 C.F.R.
§ 20.11(g), (i).

Obendorf's case went to trial. Over the course of seven
days, a jury heard testimony from state and federal wildlife
agents, Obendorf employees, and local residents. As the
indictment foreshadowed, 50 C.F.R. § 20.21(i)(1) played a
central role in Obendorf's prosecution. The government's
trial brief characterized § 20.21(i)(1) as a potential "safe
haven" from an unlawful baiting conviction, and the district
court instructed the jury on the first day of trial that the
government had to prove "the agricultural practice
exception"—the court's term for § 20.21(i)(1)—"does not
apply." Consistent with that view, the prosecutor explained
to the jury during his opening statement that the MBTA
regulations create a "normal agricultural practices exception"
that allows farmers to work their land without fear of
prosecution under the MBTA, so long as their practices are in
accordance with official recommendations from State
Extension Specialists of the Cooperative Extension Service.

The government called three State Extension Specialists
from the University of Idaho in an attempt to prove that
Obendorf did not qualify for what it referred to as
§ 20.21(i)(1)'s safe haven. All three witnesses testified that
no then-existing official recommendations of the Cooperative
Extension Service endorsed Obendorf's farming practices.
On cross-examination, Obendorf tried to elicit an official

opinion regarding his farming practices, but the government objected and argued that his questions were irrelevant and beyond the scope of direct examination. The district court agreed. It ruled that the "safe harbor" does not apply unless the farmer "obtain[s] the official recommendation before . . . engag[ing] in a practice." In other words, the district court ruled that any post-hoc endorsement from a State Extension Specialist would not bring Obendorf within the safe harbor.

The district court instructed the jury along the same lines. For the substantive baiting count, the jury instructions required the government to prove three elements beyond a reasonable doubt: (1) that Obendorf baited ducks or directed others to do the same; (2) that he did so for the purpose of facilitating a hunt aided by bait; and (3) that the "Agricultural Practice Exception" did not apply. The district court instructed the jury that the so-called Agricultural Practice Exception permits a farmer whose lands are not otherwise baited to, among other things, scatter seeds or grains "solely as the result of a normal agricultural planting, harvesting, post-harvest manipulation or normal soil stabilization practice." The instructions also included the district court's temporal requirement:

> A farmer's manipulation or practice constitutes a "normal agricultural planting, harvesting, post-harvest manipulation" or "normal soil stabilization practice" only if it is conducted according to the State Extension Service Specialists' official recommendations, whether verbal or in writing. Those official recommendations must be in existence at the time the farmer engages in his manipulation or practice.

The instruction for the conspiracy count cross-referenced the given elements of unlawful baiting, including the so-called Agricultural Practice Exception.

The jury convicted Obendorf on both counts and he timely appealed.

## STANDARDS OF REVIEW

We review de novo the district court's interpretation of the MBTA and its regulations. *United States v. Bucher*, 375 F.3d 929, 931 (9th Cir. 2004); *United States v. Ani*, 138 F.3d 390, 391 (9th Cir. 1998). We also review de novo "whether a jury instruction misstated an element of a statutory crime." *United States v. Henderson*, 243 F.3d 1168, 1171 (9th Cir. 2001). If we identify an instructional error, we will nevertheless affirm if the error was harmless beyond a reasonable doubt. *Id.* We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Decoud*, 456 F.3d 996, 1010 (9th Cir. 2006). Even if we find error, we will affirm unless the erroneous evidentiary ruling "more likely than not affected the verdict." *Id.* (quoting *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004)).

## DISCUSSION

Obendorf argues the district court misinterpreted what it called the Agricultural Practice Exception by imposing a temporal requirement that the MBTA regulations do not mandate. For the first time on appeal, the government argues that what the district court called the Agricultural Practice Exception—50 C.F.R. § 20.21(i)(1)—applies only to prosecutions for illegally *taking* migratory game birds.

According to the government's argument on appeal, § 20.21(i)(1) does not apply to unlawful baiting cases at all, so even if the district court erred by imposing a temporal requirement for obtaining recommendations from State Extension Specialists, the error was harmless.

We agree that § 20.21(i)(1) had no role to play in Obendorf's case because the indictment charged him with baiting, rather than taking, migratory birds. By attempting to prove that the so-called Agricultural Practice Exception did not apply, the government assumed a heavier burden than the law required. Having reviewed the record, we conclude that the erroneous application of § 20.21(i)(1) to Obendorf's case was harmless.

## I.

We acknowledge that the government's chief argument on appeal is a new one. In the district court, the government argued that § 20.21(i)(1) and its associated regulations created a safe harbor, but one for which Obendorf was not eligible because the State Extension Service had not previously endorsed his agricultural practices. On appeal, the government now argues that the safe harbor created by § 20.21(i)(1) was never available to Obendorf in the first place because it does not apply to the charges he faced. "We apply a 'general rule' against entertaining arguments on appeal that were not presented or developed before the district court." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) (quoting *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir. 1998)). But we have discretion to reach waived issues, and we exercise that discretion in three circumstances: (1) "in the 'exceptional' case in which review is necessary to prevent a

miscarriage of justice or to preserve the integrity of the judicial process"; (2) "when a new issue arises while appeal is pending because of a change in the law"; and (3) "when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *Id.* (quoting *Bolker v. Comm'r*, 760 F.2d 1039, 1042 (9th Cir. 1985)).

Here, we exercise our discretion to consider whether § 20.21(i)(1) is applicable to unlawful baiting prosecutions because the question is purely legal, both parties have had an opportunity to brief the issue on appeal and address it at oral argument, and resolving this question will serve to clarify the law. *See Mercury Interactive*, 618 F.3d at 992. We have a duty to "say what the law is," *Marbury v. Madison*, 1 Cranch 137, 177 (1803), and we would shirk that duty by not deciding whether § 20.21(i)(1) modifies the MBTA's ban on unlawfully baiting migratory birds, 16 U.S.C. § 704(b)(2).

## II.

The MBTA is a century-old law implementing a treaty to save migratory birds from "indiscriminate slaughter." Convention Between the United States and Great Britain for the Protection of Migratory Birds, Gr. Brit.-U.S., Aug. 16, 1916, 39 Stat. 1702; *see also* Migratory Bird Treaty Act, ch. 128, 40 Stat. 755, 755–57 (1918) (codified as amended at 16 U.S.C. §§ 703–712).[2]

---

[2] "The MBTA later incorporated elements of similar bilateral treaties between the United States and Mexico, Japan, and the Soviet Union." *United States v. Vance Crooked Arm*, 788 F.3d 1065, 1070 n.3 (9th Cir. 2015) (per curiam).

Three statutory provisions are relevant here.  First, the MBTA categorically bans a slew of conduct that could harm migratory birds—hunting, capturing, killing, possessing, selling, and more—and it authorizes the Secretary of the Interior to promulgate regulations permitting activities that the MBTA would otherwise prohibit, as long as those activities are consistent with the underlying treaties. 16 U.S.C. § 703(a); *see also id.* § 704(a) (granting the Secretary rulemaking authority).   Second, the MBTA separately prohibits any person from taking "any migratory game bird by the aid of baiting, or on or over any baited area, if the person knows or reasonably should know that the area is a baited area." *Id.* § 704(b)(1).  (The statutory term "take" means "to pursue, hunt, shoot, wound, kill, trap, capture, or collect," or to attempt any of those activities.  50 C.F.R. § 10.12.)  Finally, the MBTA outlaws baiting migratory birds so they can be hunted: it bans "plac[ing] or direct[ing] the placement of bait on or adjacent to an area for the purpose of causing, inducing, or allowing any person to take or attempt to take any migratory game bird by the aid of baiting on or over the baited area." 16 U.S.C. § 704(b)(2).

The crux of this case lies in the regulations implementing these three statutory provisions.  The MBTA regulations define "baiting" and "baited area" very broadly.  "Baiting" is the "direct or indirect placing, exposing, depositing, distributing, or scattering of salt, grain, or other feed that *could* serve as a lure or attraction for migratory game birds to, on, or over any areas where hunters are attempting to take them." 50 C.F.R. § 20.11(k) (emphasis added).  Consistent with the definition of "baiting," a "baited area" is defined as "any area on which [scattered] salt, grain, or other feed . . . *could* serve as a lure or attraction for migratory game birds to, on, or over areas where hunters are attempting to take them."

*Id.* § 20.11(j) (emphasis added). Once an area has been baited, it is considered a "baited area" that is off-limits to hunting until ten days after all the bait is removed. *Id.*

These broad definitions can create potential problems in agricultural areas. Common farming practices inevitably leave behind grains and other bird feed in fields, and migratory game birds are loathe to pass up a free meal. Because many species, including ducks, find crops like cereal grains and corn particularly appetizing, at least one other court has recognized that the "broad definition of baited areas would seem to preclude the hunting of migratory waterfowl over all agricultural areas." *M.J. Farms, Ltd. v. U.S. Fish & Wildlife Serv.*, 593 F. Supp. 2d 907, 913 (W.D. La. 2008).

Section 20.21(i)(1) attempts to remedy this problem. As set forth above, that regulation carves out an exception to the MBTA's ban on hunting over baited areas. *See* Migratory Bird Hunting: Regulations Regarding Baiting and Baited Areas, 64 Fed. Reg. 29,799, 29,800–01 (June 3, 1999) (discussing how the regulatory scheme seeks to harmonize hunting and certain agricultural practices). Section 20.21(i)(1) provides that, notwithstanding the general prohibition on hunting over bait, nothing prohibits "the taking of any migratory game bird" on or over "[s]tanding crops or flooded standing crops (including aquatics); standing, flooded, or manipulated natural vegetation; flooded harvested croplands; or lands or areas where seeds or grains have been scattered solely as the result of a normal agricultural planting, harvesting, post-harvest manipulation or normal soil stabilization practice." 50 C.F.R. § 20.21(i)(1)(i). This exception applies so long as the listed areas are "not otherwise baited." *Id.* In other words, farms are not exempt from the MBTA simply because they are farms. If grain is

scattered as part of a farm's normal agricultural activities and migratory birds happen to be drawn to it, the birds are fair game. But if grain is scattered for the purpose of baiting, the birds may not be taken.

The parties agree that § 20.21(i)(1) permits hunting over agricultural lands that might otherwise be off-limits. What they disagree about—and what we must decide—is whether § 20.21(i)(1) also modifies the MBTA's ban on unlawful baiting. We conclude it does not.

We begin with the plain language of the regulation. *United States v. Bibbins*, 637 F.3d 1087, 1091 (9th Cir. 2011); *United States v. Bucher*, 375 F.3d 929, 932 (9th Cir. 2004). By its terms, § 20.21 applies only to takings—that is, hunting, shooting, and similar activities. *See* 50 C.F.R. § 20.21; *see also id.* § 10.12 (defining "take"). Section 20.21 provides that migratory game birds "may be taken by any method except those" it specifically prohibits. It then goes on to identify specific hunting methods that are illegal, like targeting migratory game birds with machine guns or explosives. *See, e.g.*, 50 C.F.R. § 20.21(a). Notably, the regulation is titled "What *hunting* methods are illegal?" *Id.* § 20.21 (emphasis added).

Consistent with § 20.21's overall focus on prohibited hunting methods, § 20.21(i)(1) concerns only hunting over bait—not baiting by itself. Section 20.21(i) makes plain that hunting over bait is an illegal hunting method, mirroring the Act's statutory prohibition. *Compare* 50 C.F.R. § 20.21(i) ("No persons shall take migratory game birds . . . [b]y the aid of baiting, or on or over any baited area . . . ."), *with* 16 U.S.C. § 704(b)(1) ("It shall be unlawful for any person to . . . take any migratory game bird by the aid of baiting, or on

or over any baited area . . . ."). The next subsection, § 20.21(i)(1), allows hunting over specified lands that would otherwise seem to qualify as "baited areas." 50 C.F.R. § 20.21(i)(1). Taken together, this arrangement does not alter what it means to bait a field, but it tells hunters where they *cannot* hunt, before carving out some otherwise-off-limits areas where they *can*.

The format of this regulatory scheme also points to the conclusion that § 20.21(i)(1) does not create an exception to the Act's ban on unlawful baiting, and applies only to unlawful hunting. Chapter I of Title 50 of the Code of Federal Regulations houses a variety of FWS regulations, and the MBTA regulations reside in Part 20 of Subchapter B. The first provision of Part 20 states that "[t]he regulations contained in this part relate only to the *hunting* of migratory game birds." 50 C.F.R. § 20.1(a) (emphasis added). Section 20.21 is located within Subpart C of Part 20—titled "Taking"—alongside restrictions on hunting seasons and how many birds may be taken in a single day. *See id.* §§ 20.20–.26.

Finally, the legislative history of the MBTA and the history of the regulations that implement it confirm our reading. Until 1998, unlawful baiting was not a discrete offense under the MBTA. *See* Migratory Bird Treaty Reform Act of 1998, Pub. L. No. 105-312, § 102, 112 Stat. 2956, 2956. Yet a version of § 20.21(i) existed even before unlawful baiting was separately outlawed. *See* Migratory Bird Hunting: Regulations Regarding Baiting and Baited Areas, 64 Fed. Reg. 29,799, 29,803 (June 3, 1999); *see also United States v. Adams*, 174 F.3d 571, 574 (5th Cir. 1999) (analyzing an earlier version of 50 C.F.R. § 20.21(i)). It would be difficult to conclude that § 20.21(i) and any of its

subsections create an exception to the MBTA's ban on unlawful baiting because the regulation existed in substantially the same form before baiting became a separate crime.[3]

Obendorf argues that our interpretation of § 20.21(i)(1) would lead to an absurd result because a person could avoid prosecution for *hunting* over a farmer's field by finding refuge in § 20.21(i)(1), but the farmer could still be prosecuted for *baiting* the same field even though he or she was simply farming the land. His fear is misplaced. To convict a person of unlawful baiting, the government must prove that defendant placed bait "*for the purpose of* causing, inducing, or allowing any person to take or attempt to take any migratory game bird by the aid of baiting." 16 U.S.C. § 704(b)(2) (emphasis added). The Act's *mens rea* requirement ensures that innocent farmers are not ensnared.

In sum, we conclude that 50 C.F.R. § 20.21(i)(1) does not create a so-called Agricultural Practice Exception to the MBTA's ban on unlawful baiting; it instead permits hunting over certain lands that would otherwise be off-limits.[4]

---

[3] Obendorf suggests FWS simply forgot to account for the change when it updated its regulations, but FWS published a notice of its rule change in the Federal Register that explicitly acknowledged the amendment. *See* Regulations Regarding Baiting, 64 Fed. Reg. at 29,800 ("[I]t is now a separate offense to place or direct the placement of bait . . . .").

[4] The Fourth Circuit reached a different conclusion in an unpublished per curiam opinion in *United States v. Cathey*, 619 F. App'x 207, 210–11 (4th Cir. 2015) (per curiam). In *Cathey*, the court affirmed a conviction for unlawful baiting where the trial involved questions about whether the defendant's farming activities fell within the scope of § 20.21(i)(1). *Cathey*, 619 F. App'x at 210–12. But *Cathey* does not analyze the

Consequently, we conclude that § 20.21(i)(1) was not relevant to the baiting charges Obendorf faced.

### III.

The district court's temporal requirement cropped up in its jury instructions and in the evidentiary rulings that prevented Obendorf from eliciting opinions about his farming practices when he cross-examined the three State Extension Specialists who testified at trial. The government argues any error was harmless because § 20.21(i)(1) does not apply to the baiting charges at issue in this case. We agree that any error in the jury instructions was harmless. The evidentiary rulings present a closer question.

The jury instructions saddled the government with a burden the law does not prescribe: to prove beyond a reasonable doubt that the so-called Agricultural Practice Exception did not apply. The instruction for the substantive baiting charge, which the conspiracy charge cross-referenced, stated:

> In Count Two, Mr. Obendorf is charged with Placing Bait for Migratory Game Birds, in violation of the Migratory Bird Treaty Act. In order for Mr. Obendorf to be guilty of this charge, the Government must prove each of the following elements beyond a reasonable doubt:

threshold question of whether § 20.21(i)(1) applies in unlawful baiting cases. Insofar as *Cathey* represents the Fourth Circuit's considered judgment on the issue, we reach a different conclusion.

1.  That on or about November 2013, Mr. Obendorf placed or directed the placement of bait on or adjacent to an area;

2.  Mr. Obendorf did so for the purpose of causing, inducing, or allowing any person to take or attempt to take any migratory game bird by the aid of baiting on or over a baited area; and

3.  The Agricultural Practice Exception does not apply.

If the Government fails to prove any one of these elements beyond a reasonable doubt, your verdict on this Count must be Not Guilty.

This instruction tasked the government with disproving an exception that did not apply in the first place. Consequently, we conclude that any error in the jury instructions was harmless beyond a reasonable doubt. *See United States v. Pheaster*, 544 F.2d 353, 362 n.3 (9th Cir. 1976) (finding harmless error where "[t]he instructions placed a heavier burden on the government than was proper" and "the defendants were convicted under [the] heavier standard").

The district court's evidentiary rulings are thornier. Obendorf was not allowed to cross-examine the three State Extension Specialists who testified at trial about whether his farming practices comported with their official recommendations. In one sense, any error on this score was harmless because no so-called Agricultural Practice Exception was available to Obendorf. But Obendorf argues

that he was disadvantaged because he was prevented from eliciting testimony that may have helped show he lacked the requisite intent to bait the duck field. He also argues that he was prejudiced because the government effectively invited him to construct a defense theory around a regulatory safe harbor that it now maintains does not apply. We are leery of the government's shift in position and note that its legal error surely added to the expense, effort, and time required to litigate this case. Nevertheless, our review of the record convinces us that this error did not affect the verdict. *United States v. Decoud*, 456 F.3d 996, 1010 (9th Cir. 2006).

To convict Obendorf of illegal baiting, the government had to prove beyond a reasonable doubt: (1) that Obendorf baited the duck field, or ordered others to bait the duck field; and (2) that he did so in order to facilitate hunting aided by bait. *See* 16 U.S.C. § 704(b)(2). The evidence establishing both these elements was extremely strong.

First, the jury heard from multiple witnesses that Obendorf directed his employees to bait the duck field. Andrew Deboer, a former Obendorf farmhand, testified that Obendorf told him to configure the combine harvester used on the duck field so that it would spill corn kernels onto the ground to "leave behind the maximum amount of corn for the ducks." According to Deboer, this directive was unique to the duck field: when he harvested other cornfields on Obendorf's property, he had to readjust the combine's settings and regularly check to ensure that he was not "losing too much grain." Another former employee, Herb Troyer, gave similar testimony. Troyer told the jury that he worked for Obendorf and his sons for five years, including a stint as a combine operator. Like Deboer, Troyer testified that he was supposed to harvest most of Obendorf's cornfields as

completely as possible, but he received special instructions from Obendorf about the duck field. For it, Troyer was told to "open the combine up[,] . . . spilling everything out the back."

The jury also heard from Josh Kling, an experienced duck hunter who worked as a mechanic on Obendorf's farm for several years but had since fallen out with Obendorf. Kling testified that he consulted with Obendorf about how to best manage the property for duck hunting, and that he and Obendorf discussed strip combining the duck field but not Obendorf's other cornfields. Kling told the jury that he and Obendorf discussed harvesting the duck field by "clos[ing] up the combine to kind of let a bunch of the corn blow out the back of it . . . [t]o leave it on the ground for the ducks, to feed the ducks."

Ample evidence also established that Obendorf's scheme was designed to lure ducks for hunting. For example, Kling testified that when "hunting [in the duck field] got bad," Obendorf directed him to knock down still-standing corn, under the guise of creating a "windstorm," to feed the ducks. And Andrew Deboer testified that he knew he was illegally baiting a field used for hunting, but that he did so because Obendorf told him to. Obendorf's son Brock also testified on cross-examination that they strip-combined the duck field "for hunting purposes."

On appeal, Obendorf stressed that he would have pursued a different trial strategy if he had not been led to believe he could find refuge in a regulatory safe harbor. At oral argument, he indicated that, but for the government's erroneous representation that the Agricultural Practice Exception was a potential defense, he would have devoted

more energy to undercutting the government's proof on the two actual elements of unlawful baiting. But our review of the record reveals that Obendorf did just that, and the jury was not persuaded.

First, Obendorf introduced evidence that he was simply farming and did not intend to bait the duck field for hunting. He called his son and another employee to testify that they strip-combined the duck field so that their cattle could eat the unharvested corn in the spring. Obendorf also called a local farmer who testified that Obendorf's farming practices were not out of the ordinary, and that some spillage from a combine is inevitable.

Second, Obendorf sought to undermine the credibility of the government's witnesses. On cross-examination, he asked government witnesses about prior convictions, past game violations, and unsavory personal remarks. One government witness admitted that employees from the Idaho Department of Fish and Game occasionally hunted the duck field. And in his case-in-chief, Obendorf elicited testimony from one of his employees that investigators threatened the employee into cooperating. Perhaps most importantly, the jury heard that Obendorf and Josh Kling—a key government witness who provided the initial tip that Obendorf was baiting ducks—were in a "full-blown feud" at the time of trial, and that Kling cooperated with investigators out of animosity towards Obendorf.

Finally, the district court did not prevent Obendorf from challenging the government's evidence regarding his intent. The district court explained that Obendorf could, in his case-in-chief, "introduce evidence from a farmer or farm expert" that his practices "had legitimate farming purposes other than

22          UNITED STATES V. OBENDORF

baiting a field for hunters," to rebut the government's proof that he intended to lure ducks for hunting. The district court explained that such testimony was not categorically precluded, but that it would not be allowed on cross-examination of witnesses who "were called simply to discuss the regulatory Agricultural Practice Exception" because it went beyond the scope of the direct examination. Nothing in the district court's ruling prevented Obendorf from calling the same three State Extension Specialists during his case-in-chief and asking them to opine on his farming practices. In fact, the district court concluded, "this ruling does not block the defense from putting on evidence during their case regarding the 'purpose' element that the Government must prove."

\*     \*     \*

In the end, we cannot see what Obendorf would have done differently if the parties had not misapprehended the MBTA regulations. In a trial without the distraction of § 20.21(i)(1), the government would have had to prove: (1) that Obendorf baited the duck field, or ordered others to bait the duck field; and (2) that he did so in order to facilitate hunting aided by bait. *See* 16 U.S.C. § 704(b)(2). The evidence establishing those elements was extremely strong, even in the face of Obendorf's attempts to undercut the government's proof. Moreover, the jury instructions treated the two actual elements of unlawful baiting as wholly discrete from the so-called Agricultural Practice Exception, ameliorating any potential for confusion. In the face of overwhelming evidence establishing that Obendorf baited the duck field in order to facilitate duck hunting, we conclude that the erroneous application of § 20.21(i)(1) did not affect the verdict. *See Decoud*, 456 F.3d at 1010.

**Conclusion**

The Migratory Bird Treaty Act regulations do not create a regulatory exception to the MBTA's ban on unlawful baiting.  Obendorf was charged with unlawful baiting, not unlawful hunting, so 50 C.F.R. § 20.21(i)(1) could not have immunized his conduct.  Although the parties misapprehended the law below, any error was harmless. Accordingly, Obendorf's conviction is **AFFIRMED.**